IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* VIB PARTNERS, *et al.*, | * |
| | * |
| Plaintiffs, | * |
| | * |
| v. | * Civil Action No. RDB-21-2232 |
| LHC GROUP, INC., | * |
| | * |
| Defendants. | * |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## **MEMORANDUM ORDER**

Relators VIB Partners, John Estabrook, and Leann Marshall filed this *qui tam* action on behalf of the United States under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq*.[1] Through the operative *qui tam* Complaint, Relators contend that Defendant LHC Group, Inc. ("LHC") defrauded the United States Government by falsifying patient data on the Medicare Outcome and Assessment Information Set ("OASIS") system to collect inflated Medicare reimbursements. (Compl. ¶¶ 3–4, ECF No. 1.) Now pending is Defendant LHC Group's Motion to Dismiss or to Transfer in the Alternative (ECF No. 17). The parties' submissions have been reviewed and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2021). For the reasons set forth below, Defendant's Motion is construed as a motion to transfer and is

---

[1] As Judge Hollander of this Court has noted, the False Claims Act and Maryland False Claims Act "allow a private party, as relator, to sue on behalf of the government to recover damages against defendants who have caused fraudulent claims for payment to be submitted against the public fisc. As an incentive to bring such suits, a successful relator is entitled to share in the government's recovery from the defendants." *U.S. ex rel. Palmieri v. Alpharma, Inc.*, 928 F. Supp. 2d 840, 842 (D. Md. 2013).

**GRANTED**. This case is hereby **TRANSFERRED** to the United States District Court for the Eastern District of Tennessee.

## BACKGROUND

A court ruling on a motion to dismiss or a motion to transfer "accept[s] as true all well-pleaded facts in a complaint and construe[s] them in the light most favorable to the plaintiff." *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017) (citing *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015)); *see also Cosmopolitan Inc. v. PNC Bank, Nat'l Ass'n*, No. GLR-19-2744, 2020 WL 4287439, *3 (D. Md. July 27, 2020) (motions to transfer). The following facts are derived from Relators' *qui tam* Complaint and accepted as true for the purpose of Defendant's motion.

Defendant LHC Group, Inc. ("LHC") "is a provider of home health and hospice services that primarily services elderly patients, the majority of whom are beneficiaries of Government health insurance programs." (Compl. ¶ 17, ECF No. 1.) Home health services are a cost-effective alternative to traditional inpatient care, and a guaranteed Medicare benefit for patients who are certified as homebound. 42 U.S.C. § 1395f(a). (Compl. ¶¶ 30–34, 45 n.4.) Accordingly, agencies such as LHC Group may obtain reimbursement through Medicare for home health services they provide. (Compl. ¶¶ 34, 38.) Medicare reimburses home health services at a fixed rate for each incremental sixty-day period of care provided to each patient. (*Id.* ¶ 44.) This rate is calculated based on the patient's health conditions, clinical characteristics, and service needs, as documented in the OASIS system. (*Id.* ¶¶ 39–43.)

Relators Leann Marshall, VIB Partners, and John Estabrook[2] collectively allege that "LHC implements a corporate-wide scheme in which it directs its facilities to systematically falsify the coding and assessment of patient's health conditions, and the number of therapy and nursing visits provided to patients," thereby submitting false claims to Medicare and inflating its Medicare reimbursements. (*Id.* ¶¶ 3, 109–60, 256–57.) Among other allegations, Relators claim that LHC adjusts patients' symptoms to satisfy the Medicare definition of "homebound," changes the nature of the healthcare services provided to eligible patients, and increases the number of recorded visits to each patient without regard to whether those visits are medically necessary—all in an effort to wrongfully inflate its Medicare reimbursements. (*Id.* ¶¶ 101, 166, 193, 239.) Relators contend that LHC accomplishes these changes by directing clinicians, coders, and low-level employees to change their OASIS entries, informing its facility managers and directors to "override" clinicians' OASIS assessments, and using a software program to "scrub" OASIS data. (*Id.* ¶¶ 101–04, 109, 112–16, 123–30.)[3]

---

[2] Relator Leann Marshall is a registered nurse who was employed as a clinician and team leader at the University of Tennessee Medical Center Home Care Services, LLC, a facility owned and operated by Defendant, until her termination on June 2, 2016. (*Id.* ¶ 16.) Relator John Estabrook was employed as the Divisional Vice President of Operations for LHC, and managed LHC operations in Washington, D.C., West Virginia, and Ohio. (*Id.* ¶ 15.) Relator VIB Partners is a partnership between two LHC corporate officials, including Estabrook. (*Id.* ¶¶ 14–15, 23.) According to the Complaint, both partners "managed multiple locations for LHC over time and in different geographies," and were responsible for reviewing "retrospective reports regarding OASIS scoring of Medicare patients and claims submitted over time." (*Id.* ¶¶ 23–25.) Relators claim that this broad scope gave VIB Partners "personal knowledge concerning LHC's knowledge of the fraudulent conduct, and the nationwide scope of LHC's fraudulent practices." (*Id.* ¶ 24.)

[3] Relators further allege that LHC was aware of the impropriety of these changes since at least 2011, when internal audits reflected that improper OASIS entries had been submitted to Medicare. (*Id.* ¶¶ 130–34.) In 2017, LHC conducted approximately 72,000 management overrides in its Beltway division despite its managers acknowledging that these overrides "look[ed] like fraud." (*Id.* ¶¶ 134, 136–40.) In 2019, LHC may have conducted as many as 63,000 overrides nationally. (*Id.* ¶ 143.) Collectively, Relators allege that these practices resulted "in large volumes of inflated claims paid by Medicare." (*Id.* ¶ 233.)

3

This is not Relators' first attempt to bring a *qui tam* action against LHC for this alleged scheme. In 2017, Marshall and VIB filed separate FCA complaints against LHC in Tennessee: Marshall filed in the United States District Court for the Western District of Tennessee, while VIB filed in the United States District Court for the Eastern District of Tennessee. *See United States ex rel. Marshall v. Univ. of TN Med. Ctr. Home Care Servs., LLC*, No. 3:17-CV-96, 2021 WL 3743189, at *4 (E.D. Tenn. Aug. 23, 2021). When the United States declined to intervene, Marshall's case was transferred to the Eastern District of Tennessee and consolidated with VIB's action on July 17, 2020. *Id.* Thereafter, Relators filed their Consolidated Amended Complaint. *Id.* Through their Consolidated Amended Complaint, Relators claimed that LHC was submitting inflated Medicare claims through the same "corporate-wide" OASIS override scheme at issue in this case. (Consolidated Amd. Compl. ("CAC") ¶¶ 3–8; ECF No. 24-5.) Relators further alleged that Marshall was improperly terminated by UTMC after reporting LHC's unlawful conduct. (*Id.* ¶ 9.)

LHC moved to dismiss the case, and on August 23, 2021, the United States District Court for the Eastern District of Tennessee granted this motion in part, concluding that the filing of *United States ex rel. Bowling v. LHC Group, Inc.*, No. 6:14-cv-94 (E.D. Ky. Apr. 18, 2014), barred the Consolidated Amended Complaint under the FCA's jurisdictional first-to-file bar, as Relators' claims were based on the same "essential facts" as the earlier-filed *Bowling* case.[4]

---

[4] *Bowling* featured a *qui tam* action against LHC and its subsidiary, Lifeline Health Care of Pulaski, LLC. (Bowling Compl. ¶¶ 17–18, ECF No. 24-6.) In *Bowling*, the Relator alleged that Lifeline Health Care of Pulaski, LLC, a subsidiary of LHC, trained clinicians to provide and record home healthcare services to ineligible patients, and to seek Medicare reimbursement for these services. (*Id.* ¶¶ 68–132.) Among other similarities, Bowling alleged LHC (1) "upcoded OASIS assessments;" (2) "increased the recommended number of visits for patients;" (3) "submitted bills for services that were not medically necessary or not provided;" and (4) trained its employees "to falsify patients' needs and

4

*See Marshall*, 2021 WL 3743189, at *10. Accordingly, the district court dismissed Relators' FCA claims without prejudice, but allowed Marshall's retaliation claim to move forward. *Id.* at *15. On September 21, 2021, Relators appealed the dismissal of their FCA claim to the United States Court of Appeals for the Sixth Circuit. (Marshall Docket Entries, ECF No. 24-4.) On October 20, 2021, Relators voluntarily dismissed this appeal after the Sixth Circuit noted the interlocutory nature of the district court's order and requested briefing on its jurisdiction to adjudicate the appeal. (Show Cause Ord., ECF No. 24-10; Dismissal Ord., ECF No. 24-11.)

*Bowling* was voluntarily dismissed by the Relators in June 2018—approximately one year following the filing of the two Tennessee cases that were consolidated into *Marshall*, and three years prior to *Marshall*'s dismissal on August 23, 2021. (Bowling Stipulation of Dismissal, ECF No. 24-8.) Accordingly, Relators filed the operative Complaint in this Court on September 30, 2021—nine days after they appealed the dismissal of their Consolidated Amended Complaint in *Marshall*, and three weeks before they voluntarily dismissed that appeal. (*See* Compl. ¶ 1.) The operative Complaint reiterates the FCA claims that were dismissed by the Eastern District of Tennessee, alleging that LHC Group "directs its facilities to systematically falsify the coding and assessment of patients' health conditions" by altering and overriding patient health and treatment data in the OASIS system. (Compl. ¶¶ 1–8.) Relators contend that these allegations "have been explicitly refiled to cure the first-to-file issue" following the voluntary dismissal of the *Bowling* action, which had triggered the statutory bar. (Pls.' Resp. Opp. 15.)

---

include secondary diagnoses on the OASIS assessments." *Marshall*, 2021 WL 3743189, at *4 (citing Bowling Compl. ¶¶ 94, 121, 122, 126–27.) *Bowling* was voluntarily dismissed by the Relators in June, 2018—approximately one year following the filing of the two Tennessee cases that were consolidated into *Marshall*, and three years prior to *Marshall*'s dismissal on August 23, 2021. (Bowling Stipulation of Dismissal, ECF No. 24-8.)

5

On April 26, 2022, Defendant filed the instant Motion to Dismiss or to Transfer in the Alternative (ECF No. 17). Through this motion, Defendant requests dismissal under several FCA statutory bars and challenges the sufficiency of the Complaint. (*See* Def.'s Mem. Supp. Mot. Dismiss 1–3, ECF No. 17-1.) In the alternative, Defendant asks this Court to transfer this matter to the United States District Court for the Eastern District of Tennessee, where *Marshall* remains pending. (*Id.*)

This motion is now ripe for review.

## ANALYSIS

As a threshold matter, Defendant asks this Court to transfer this case to the United States District Court for the Eastern District of Tennessee, where *Marshall* was litigated. Pursuant to 28 U.S.C. § 1404(a), "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district . . . where it might have been brought." The movant bears the burden to demonstrate that transfer is proper. *Stratagene v. Parsons Behle & Latimer*, 315 F. Supp. 2d 765, 771 (D. Md. 2004). A district court has great discretion in determining whether to transfer a case under Section 1404(a), and the decision to transfer an action is guided by an "individualized, case-by-case consideration of convenience and fairness." *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988) (quoting *Van Dusen v. Barrack*, 376 U.S. 612, 622 (1964)); *accord Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 34 (1998); *Capitol Payment Systems, Inc. v. Di Donato*, No. ELH-16-882, 2017 WL 2242678, at *8 (D. Md. May 23, 2017).

This Court must consider four factors in order to determine whether transfer is proper: "(1) the weight accorded to plaintiff's choice of forum; (2) witness convenience and access;

6

(3) convenience of the parties; and (4) the interests of justice." *United States ex rel. Salomon v. Wolff*, 268 F. Supp. 3d 770, 774 (D. Md. 2017); *Mamani v. Bustamante*, 547 F. Supp. 2d 465, 469 (D. Md. 2008). "The statute provides no guidance as to the weight given . . . to . . . the factors." *D2L Ltd. v. Blackboard, Inc.*, 671 F. Supp. 2d 768, 777–78 (D. Md. 2009) (internal alterations omitted) (quoting *Byerson v. Equifax Info. Servs., LLC*, 467 F. Supp. 2d 627, 632 (E.D. Va. 2006)). "Some courts consider convenience the most important factor; others have stated that '[t]he interest of justice may be decisive . . . even though the convenience of the parties and witnesses point in a different direction.'" *Id.* at 778 (quoting *Byerson*, 467 F. Supp. 2d at 635). In either event, "[t]he decision whether to transfer venue is committed to the sound discretion of the trial court." *Mamani*, 547 F. Supp. at 469 (citing *Brock v. Entre Computer Ctrs., Inc.*, 933 F.2d 1253, 1257 (4th Cir. 1991)). However, "[u]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Collins v. Straight, Inc.*, 748 F.2d 916, 921 (4th Cir. 1984) (quoting *Gulf Oil v. Gilbert*, 330 U.S. 501, 508 (1946)) (alteration in original).

For the reasons discussed below, this Court concludes that transfer is appropriate.

**I.     Weight Accorded to Plaintiffs' Choice of Forum**

This Court has recognized that "a plaintiff's choice of forum is generally 'entitled to substantial weight.'" *Mamani*, 547 F. Supp. 2d at 473 (quoting *Bd. of Trs., Sheet Metal Workers Nat'l Fund v. Baylor Heating & Air Conditioning, Inc.*, 702 F. Supp. 1253, 1256 (E.D. Va. 1988)). However, the plaintiff's choice of forum is accorded substantially less weight when the plaintiff is litigating in a foreign forum, or where the forum has no connection to the controversy. *Id.* (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255–56 (1981); *Lynch v. Vanderhoef Builders*, 237

7

F. Supp. 2d 615, 617 (D. Md. 2002); *Dicken v. United States*, 842 F. Supp. 91, 93 (D. Md. 1994)). Moreover, "federal district courts throughout the nation have held that, in *qui tam* actions, the plaintiff's choice of venue is not entitled to the same level of deference as in other actions." *United States ex rel. Roop v. Arkray USA, Inc.*, No. 1:04 CV 87-M-D, 2007 WL 884691, at *2 (N.D. Miss. Mar. 19, 2007); *accord United States ex rel. Thomas v. Duke Univ.*, No. 4:13-cv-17, 2017 WL 1169734, at *3 (W.D. Va. Mar. 28, 2017) (observing that a district court in the Fourth Circuit has held the same).

This Court finds that Relators' choice to litigate in Maryland is entitled to little weight. As Defendant notes, "Relators vastly overstate the Complaint's tangential connections to Maryland." (Def.'s Repl. Supp. 20, ECF No. 27.) Relators do not reside in Maryland and are litigating in a foreign forum. *Cf. Salomon*, 268 F. Supp. 3d at 775 (observing that less deference is warranted where "a plaintiff chooses to bring suit in a foreign forum as opposed to his or her home jurisdiction."). Their claims arise out of conduct they observed in other jurisdictions: Marshall was employed by an LHC subsidiary in Tennessee, while Estabrook alleges that he managed LHC's affairs in Washington D.C., West Virginia, and Ohio. (Compl. ¶¶ 15–16.) Indeed, to the extent the Complaint references Maryland at all, it does so only as one of several states in which LHC operated its facilities and communicated with its managers. (Compl. ¶¶ 83, 148 (noting LHC runs facilities in "Arizona, Florida, Maryland, North Carolina, Tennessee, and Washington."); *id.* ¶ 89 (noting that LHC's Beltway Division includes "West Virginia, Tennessee, Virginia, Maryland, the District of Columbia, and part of Ohio"); *id.* ¶¶ 94–95, 189 (identifying Margaret Green, regional manager of LHC's Maryland facilities, as one recipient of communications directed to **all** of LHC's managers).)

8

Relators' counterexamples are unpersuasive. Relators emphasize in their opposition that many of their allegations are connected to alleged practices that occurred in the Beltway Division, and to communications sent by the Beltway Division Vice President, Susan Sylvester. (Resp. Opp. 32–33.) However, this consideration does not tilt the needle in either direction, as both Maryland and Tennessee are part of the Beltway Division. (Compl. ¶ 89.) Relators' sole Maryland-specific claim is their assertion that "LHC's National Therapy Director, John DiCapo, specifically used reimbursement rates in Rockville, Maryland to illustrate how the base rate, case mix, and other factors affect LHC's ultimate reimbursement." (Compl. ¶ 93.) However, this allegation is used only to provide an illustrative example of how Medicare reimbursements are calculated at LHC facilities. (*Id.*) It is neither referenced nor discussed in any manner throughout the remainder of the Complaint and bears little connection to Relators' central allegations.

Finally, as this False Claims Act case is a *qui tam* action, the United States is the true party in interest, and the relators' choice of venue receives only minimal deference. *United States ex rel. Thomas v. Duke Univ.*, No. 4:13-cv-17, 2017 U.S. Dist. LEXIS 45037, at *9-10 (W.D. Va. Mar. 28, 2017). Reinforcing this conclusion, Defendant observes that the United States supported consolidating the cases filed by Relator VIB and Relator Marshall in Tennessee, arguing that consolidation would "conserve the parties' resources, as well as judicial resources, by ensuring that any litigation resulting from the multiple pending actions and the ongoing investigation of LHC is before one judge." (Repl. Supp. 18 (quoting *United States ex rel. VIB Partners v. LHC Group, Inc.*, ECF No. 28, 3:17-cv-978 (M.D. Tenn. Mar. 1, 2019)). Allowing Relators to litigate in this Court while their initial case remains pending in Tennessee would

undermine judicial economy and run contrary to these concerns. Accordingly, this Court concludes that Relators' choice of forum is entitled to little weight in this case, and this factor favors the Defendant.

## II. Convenience of Witnesses

This Court has noted that convenience of witnesses is "perhaps the most important factor to consider when analyzing a § 1404(a) motion to transfer venue." *Ralph v. Long*, Civ. No. 8:99-3281-DKC, 2001 WL 706034, at *3 (D. Md. June 14, 2001) (Chasanow, J.). "In this district, motions to transfer have been regularly granted where the defendant has shown that most of its key witnesses are residents of another district." *Cronos Containers, Ltd. v. Amazon Lines, Ltd.*, 121 F.Supp.2d 461, 465 (D. Md. 2000).

The parties spend little time discussing the convenience of witnesses. Neither party has offered a supporting declaration or affidavit attesting to the identities of their likely witnesses. *Cf. Stratagene v. Parsons Behle & Latimer*, 315 F. Supp. 2d 765, 771 (D. Md. 2004) (observing that a movant requesting transfer on account of witness inconvenience "should submit affidavits from witnesses and parties" explaining the challenges they would experience absent transfer). LHC contends without example that "the allegations of the complaint compel the conclusion that many relevant witnesses are located in Tennessee (and there is no evidence that relevant witnesses are located in Maryland)." (Mem. Supp. 33.) Relators counter that the Complaint refers to locations in Maryland, that the Complaint identifies LHC's managers "in Maryland and the nearby Beltway territories," and that there are no allegations "that the directors and managers responsible for the alleged fraud in the Complaint have any nexus to Tennessee." (Resp. Opp. 34.)

10

On balance, this factor is neutral. Relators are correct that Defendant has not shown how litigation in Tennessee would be more convenient to any identifiable witness. However, while "[t]he Complaint identifies locations in Maryland that are involved in the alleged fraud," (*id.* at 33–34), Relators' FCA claims "relate to corporate-wide schemes directed and controlled by LHC and implemented systematically at all of its facilities nationwide," (Compl. ¶ 18). As noted above, Relators' personal knowledge stems from events that occurred outside Maryland, and Relators fail to differentiate Maryland from the other states that may have been affected by these nationwide, corporate-wide schemes in any significant way. Accordingly, is unclear why it would be necessary for Relators to depose witnesses from Maryland, as opposed to the thirty-four other states and eight geographic divisions that contain LHC's healthcare facilities. (*See* Compl. ¶¶ 89–90.) Even assuming that this case requires evidence from LHC's Beltway Division, and participation by Beltway Division Vice President Susan Sylvester, Relators have acknowledged that the Beltway Division encompasses *both* Tennessee and Maryland. (*Id.* ¶ 89 (noting that the Beltway encompasses "West Virginia, **Tennessee**, Virginia**, Maryland,** the District of Columbia, and part of Ohio.") (emphasis added).) Accordingly, the convenience of witnesses is a neutral factor and does not significantly affect the transfer analysis in this case.

### III.     Convenience of the Parties

In evaluating convenience of the parties, courts consider the impact of transfer on both parties, but may not "shift the burden of inconvenience from the defendant to the plaintiff." *Salomon*, 268 F. Supp. 3d at 776. In this case, LHC observes that "LHC is already litigating the related *Marshall/VIB I* case in Tennessee against the very same Relators." (Mem. Supp. 33.) In light of this parallel litigation, upon transfer to the Tennessee district court, "the parties

11

Case 3:22-cv-00415-CLC-DCP   Document 28   Filed 11/01/22   Page 11 of 14
PageID #: 596

would only have to deal with one court, one clerk's office, and one set of local rules—which the parties are familiar with" following five years of proceedings in Tennessee. *Cf. Blackboard*, 671 F. Supp. 2d at 783. Requiring identical parties to litigate related allegations in two separate forums would likely cause inconvenience and delay. As "there are economies that would result from having the cases in the same forum," *id.*, the convenience of the parties leans towards transfer.

### IV. Interests of Justice

"Consideration of the interests of justice 'is intended to encompass all those factors bearing on transfer that are unrelated to convenience of witnesses and parties.'" *Cross v. Fleet Reserve Ass'n Pension Plan*, 383 F. Supp. 2d 852, 857 (D. Md. 2005) (quoting *Baylor Heating & Air Conditioning*, 702 F. Supp. 1253, 1260 (E.D. Va. 1988)). "Factors include the court's familiarity with the applicable law, the possibility of an unfair trial and the possibility of harassment." *Id.* As noted above, "[t]he interest of justice may be decisive . . . even though the convenience of the parties and witnesses point in a different direction." *Blackboard*, 671 F. Supp. 2d at 777–78 (quoting *Byerson*, 467 F. Supp. 2d at 635).

The presence of the ongoing *Marshall* case in the Eastern District of Tennessee lends additional weight to this factor. As this Court observed in *D2L Ltd. v. Blackboard, Inc.*,

> **The interest of justice weighs heavily in favor of transfer when a related action is pending in the transferee forum.** Transfer is favored not only because litigation of related claims in the same tribunal may facilitate efficient pretrial proceedings and discovery but also because it avoids inconsistent results. Transfer is favored even if it is uncertain whether the transferred case will be consolidated with the related pending case.
>
> **The interest of justice also strongly favors transfer when a party has previously litigated a case involving similar issues and facts before the transferee court.** The transferee court's familiarity with the facts of the case

12

> and the applicable law promotes judicial economy. Litigation in the same court avoids duplicative litigation when one court has already invested substantial time and energy in the related case.

671 F. Supp. 2d 768, 783–84 (D. Md. 2009) (citations omitted) (emphasis added); *accord Samsung Elecs. Co. v. Rambus Inc.*, 386 F. Supp. 2d 708, 721 (E.D. Va. 2005) ("Transfer and consolidation will serve the interest of judicial economy in most cases where the related actions raise similar or identical issues of fact and law"); *Nutrition & Fitness, Inc. v. Blue Stuff, Inc.*, 264 F.Supp.2d 357, 363 (W.D.N.C. 2003) ("While there is obviously no guarantee that [the] cases may be consolidated, it is nonetheless expedient to allow a court that is already familiar with [the] essential arguments to adjudicate this case.").

This Court concludes that the interests of justice decisively favor transfer in this case. As both parties acknowledge, the *Marshall* case remains pending in the Eastern District of Tennessee, where the parties continue to litigate Marshall's retaliation claim against LHC. Although that claim is substantively distinct from the FCA claims that are at issue in this case, it involves identical parties and likely entails an overlap in witnesses and discovery requests. Moreover, the Eastern District of Tennessee presided over the FCA allegations in *Marshall* for five years and has "already invested substantial time and energy" in the adjudication of those issues. *Blackboard*, 671 F. Supp. 2d at 784. Although Relators correctly note that those counts were not addressed on the merits, as they were dismissed through the application of the FCA's statutory first-to-file bar, the Tennessee district court's "familiarity with the facts of the case and the applicable law" would nonetheless promote judicial economy and streamline the resolution of this matter. *Id.* at 784. Comparatively, "[i]t is inefficient to have two different courts . . . become familiar with and adjudicate essentially the same claims." *Nutrition*, 264 F.

13

Supp. 2d at 363. If the pending motion to transfer is denied, the parties will be left to pursue simultaneous, overlapping litigation and discovery in two districts, burdening the parties, their witnesses, and the judicial system as a whole. Accordingly, the interests of justice favor Defendants, and this Court concludes that transfer is warranted.

## CONCLUSION

For the foregoing reasons, it is this 1st day of November, 2022, hereby **ORDERED** that:

1. Defendant LHC Group's Motion to Dismiss or to Transfer in the Alternative (ECF No. 17) is construed as a motion to transfer and is **GRANTED**;

2. This case is **TRANSFERRED** to the United States District Court for the Eastern District of Tennessee;

3. The Clerk will transmit copies of this Memorandum Order to counsel of record; and

4. The Clerk is directed to **CLOSE THIS CASE**.

Date: November 1, 2022

_____
Richard D. Bennett
United States Senior District Judge